**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Brandon Smith, | ) | No. CV-12-2391-PHX-FJM |
| Plaintiff, | ) | **ORDER** |
| vs. | ) | |
| City of Chandler, et al., | ) | |
| Defendants. | ) | |

The court has before it defendants' motion for summary judgment (doc. 35), plaintiff's response (doc. 39), and defendants' reply (doc. 48). We also have before us defendants' motion to strike declaration of plaintiff's expert, Jesse Torrez (doc. 50), plaintiff's response (doc. 52), and defendants' reply (doc. 53).

**I.**

As an initial matter, we deny defendants' motion to strike (doc. 50). Defendants contend that we should strike and disregard the Torrez declaration in ruling on the motion for summary judgment because it is an improper attempt by plaintiff to supplement his expert report well after the close of discovery. Defendants contend that the untimely declaration contains new information and opinions that should have been included in a rebuttal report. "An objection to (and any argument regarding) the admissibility of evidence offered in

1  support of or opposition to a motion must be presented in the objecting party's responsive
2  or reply memorandum and not in a separate motion to strike or other separate filing." LRCiv
3  7.2(m)(2). Defendants' separate motion to strike violates LRCiv 7.2(m)(2), and it is
4  therefore denied (doc. 50).

## II.

6  At 8:00 p.m. on the evening of December 28, 2011, 22-year old plaintiff Brandon
7  Smith went to the home of his father and stepmother and asked if he could spend the night.
8  Brandon had been living on the streets and using drugs "off and on," and did not feel safe
9  sleeping on the streets. DSOF ex. 1 at 10. Brandon was at the end of a five-day
10 methamphetamine binge and was suffering from a persecutory delusion that he was being
11 chased by a police task force and that if caught he would be imprisoned and tortured.

12 Brandon's father described Brandon's eyes as dilated; he was sweating and seemed
13 paranoid and "drugged out." DSOF ¶ 16. Brandon went to the kitchen and picked up a large
14 kitchen knife. His father repeatedly tried to convince Brandon to give him the knife, but
15 Brandon refused, saying he felt safer with it. DSOF ¶ 24. Brandon's father told him that if
16 he didn't surrender the knife, he would call the police. DSOF ¶ 25. Brandon went to the
17 back patio to smoke a cigarette and took the knife with him. Id. Brandon's father and
18 stepmother were "both nervous" and "didn't feel comfortable with [Brandon] there the way
19 he was acting." DSOF ¶ 20. His stepmother said that she was "terrified." DSOF ¶ 20.
20 Concerned "for everybody's safety," Brandon's stepmother called 911 at 9:26 p.m., just 90
21 minutes after Brandon had arrived at their home. During the 911 call, Mrs. Smith reported
22 "he's got a knife and he won't give it up, and I'm afraid . . . . He's had a drug problem in the
23 past . . . . He's talking like he wants to kill himself, . . . he's tried to hurt himself several other
24 times . . . [and] has a history of . . . fighting with the officers." DSOF ¶ 27. This information
25 was relayed to the responding Chandler police officers.

26 Chandler police officers Brian Hawkins, Keith Smith, Blake Fairclough, and Abel

- 2 -

1  Aragon[1] responded to the 911 call, which was dispatched as a suicide attempt. DSOF ¶¶ 28-
2  29. The officers were advised that the subject had a knife, was likely on drugs, and had
3  assaulted officers before. The officers met Brandon's father at the front of the residence.
4  Officer Hawkins was the lead officer and carried a handgun. Officer Smith carried a beanbag
5  shotgun.[2] Brandon's father advised the officers that Brandon was in the backyard with a
6  knife.

7  The four officers followed Brandon's father into the house and out to the back patio,
8  where Brandon was seated on a sofa, with the knife in his hand. DSOF ¶ 30. The officers
9  formed a semicircle around Brandon, and Officer Hawkins ordered him to drop the knife.
10 DSOF ¶¶ 35, 37. Brandon refused. DSOF ¶ 39. Officer Smith saw Brandon "lunge
11 forward," bend at the waist while seated, and move the knife from the low chest to the high
12 chest. Officer Hawkins was approximately 8 feet away. DSOF ¶ 48. As Brandon moved,
13 Officer Smith deployed two beanbag rounds aimed at Brandon's thigh, just above the knee.
14 DSOF ¶¶ 48-49. At this point, Brandon plunged the knife into his neck, severing his jugular
15 vein. Once Brandon thrust the knife into his neck, Officer Hawkins holstered his gun, called
16 out "he's doing it," and rushed toward Brandon to stop him from injuring himself. DSOF
17 ¶ 45. Brandon kept thrusting the knife deeper as Officer Hawkins tried to stop him. Brandon
18 was hospitalized and on suicide watch for three months following the incident. Only 3 to 5
19 seconds had elapsed from the moment the officers exited the patio door to the stabbing.
20 DSOF ¶ 55.

---

[1] Each of these officers was originally named as a defendant in this action. Officers Hawkins, Aragon and Fairclough were dismissed with prejudice on November 14, 2013 (doc. 34).

[2] A beanbag shotgun is considered a "less lethal weapon," as opposed to a non-lethal weapon, because the bean bags can cause serious injury or death if they hit a sensitive part of the body. The weapon is intended to induce compliance by causing sudden, debilitating, localized pain, similar to a hard punch or baton strike. Deorle v. Rutherford, 272 F.3d 1272, 1277 (9th Cir. 2001).

### III.  Fourth Amendment Claim

Brandon contends that his Fourth Amendment right to be free from excessive force was violated when Officer Smith shot him with the two beanbag rounds. In evaluating a Fourth Amendment excessive force claim, we consider "whether the officers' actions were 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivations." Graham v. Connor, 490 U.S. 386, 397, 109 S. Ct. 1865, 1872 (1989). The reasonableness inquiry in an excessive force case "must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Id. Although we will consider a number of factors when evaluating the totality of the circumstances, the "most important" factor is whether the individual posed an "immediate threat to the safety of the officers or others." Bryan v. MacPherson, 630 F.3d 805, 826 (9th Cir. 2010) (citation omitted).

Brandon contends that at no time during the encounter did he say or do anything that was threatening to the officers or himself. Instead, he claims that he was shot as he moved to comply with an officer's command to stand. He argues that Officer Smith's actions were objectively unreasonable because he failed to follow specific training that all Arizona police officers receive in dealing with an emotionally disturbed person. Specifically, officers are trained to gather background information, keep the situation calm and controlled, and establish communication with the individual. Plaintiff argues that Officer Smith ignored this training and instead failed to take time to assess the situation or develop a plan. The officers did not question Brandon's father or determine Brandon's location on the patio, but instead found themselves in a tactically unsound position, in close proximity to Brandon, as soon as they exited the back door. The officers immediately cornered Brandon with weapons raised, yelling at him to drop the knife. Brandon argues that the lack of a plan caused the officers to react in an aggressive and threatening manner, unnecessarily escalating an already tense situation, and ultimately leading to Brandon stabbing himself.

Government officials performing discretionary functions generally are shielded from

- 4 -

1  liability for civil damages as long as their conduct does not violate clearly established
2  statutory or constitutional rights of which a reasonable person would have known. Harlow
3  v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982). The "purpose of qualified
4  immunity is to strike a balance between the competing 'need to hold public officials
5  accountable when they exercise power irresponsibly and the need to shield officials from
6  harassment, distraction, and liability when they perform their duties reasonably.'" Mattos
7  v. Agarano, 661 F.3d 433, 440 (9th Cir. 2011) (quoting Pearson v. Callahan, 555 U.S. 223,
8  231, 129 S. Ct. 808, 815 (2009)).

9  Qualified immunity "generally turns on the 'objective legal reasonableness' of the
10 action, assessed in light of the legal rules that were 'clearly established' at the time it was
11 taken." Anderson v. Creighton, 483 U.S. 635, 639, 107 S. Ct. 3034 (1987) (citation omitted).
12 A police officer is protected by qualified immunity if he mistakenly believed the amount of
13 force used was appropriate under the circumstances. Saucier v. Katz, 533 U.S. 194, 205, 121
14 S. Ct. 2151, 2158 (2001). Qualified immunity protects "all but the plainly incompetent or
15 those who knowingly violate the law." Messerschmidt v. Millender, 132 S. Ct. 1235, 1244
16 (2012) (citation omitted).

17 Officer Smith was not "plainly incompetent" when he fired two beanbag rounds at
18 Brandon's thigh. Even assuming that Brandon heard an officer's command to "stand up,"
19 Brandon's movement in leaning forward toward Officer Hawkins could reasonably be
20 perceived as threatening amid the tense and chaotic scene facing the officers. Officer Smith
21 knew that he was dealing with an armed, delusional, and suicidal man who had a history of
22 fighting with police officers. No more than 5 seconds had elapsed from the time the officers
23 entered the scene. Under these circumstances, Officer Smith may have mistakenly but
24 reasonably perceived Brandon's movement in standing or leaning forward as a threat toward
25 his fellow officer. See Bell v. Irwin, 321 F.3d 637 (7th Cir. 2003) (four beanbag rounds fired
26 at suicidal man armed with knives who "lean[ed] toward" a propane tank with what appeared
27 to be a cigarette lighter was objectively reasonable).

28 Even if Brandon's movements did not justify the use of deadly force, the moderate

- 5 -

1 force used by Officer Smith in firing two beanbags at Brandon's thigh in an effort to get him
2 to drop the knife was proportionate to the circumstances. See Gregory v. County of Maui,
3 523 F.3d 1103, 1107 (9th Cir. 2008) (use of force in attempting to disarm emotionally
4 unstable man holding a pen was "proportionate and reasonable"). "We take the perspective
5 of an officer on the scene without the benefit of 20/20 hindsight" and consider that police
6 officers must often make split-second judgments about the amount of force that is necessary
7 in a particular situation. Gonzalez v. City of Anaheim, ___ F.3d ___, 2014 WL 1274551 (9th
8 Cir. Mar. 14, 2014). Brandon posed a threat to the immediate safety of the officers when he
9 attempted to stand, while holding a knife, after he refused the officers' commands to give up
10 the knife. Officer Smith's actions were reasonable in light of the circumstances he faced.

11 Plaintiff's expert concluded that Officer Smith was not justified in firing the less-
12 lethal shotgun at Brandon. The expert opined that the situation could have been resolved
13 with no injuries had training and safety procedures been followed. PSOF ex. 1 at 7.

14 The fact that an expert disagrees with the officer's actions does itself not render the
15 officer's actions unreasonable. Although the expert's report may be relevant to the issue of
16 reasonableness, a plaintiff cannot avoid summary judgment "by simply producing an expert's
17 report that an officer's conduct leading up to a deadly confrontation was imprudent,
18 inappropriate, or even reckless." Billington v. Smith, 292 F.3d 1177, 1189 (9th Cir. 2002).
19 "Rather, the court must decide as a matter of law whether a reasonable officer could have
20 believed that his conduct was justified." Id. Even though the officers might have had "less
21 intrusive alternatives available to them," or perhaps under departmental guidelines should
22 have "developed a tactical plan" instead of attempting an immediate seizure, police officers
23 "need not avail themselves of the least intrusive means of responding to an exigent situation"
24 and need only act "within that range of conduct we identify as reasonable." Scott v. Henrich,
25 39 F.3d 912, 915 (9th Cir. 1994).

26 Plaintiff's reliance on Glenn v. Washington County, 673 F.3d 864 (9th Cir. 2011) is
27 misplaced. The police officers in Glenn shot 6 beanbag rounds at Lukus Glenn, an
28 emotionally disturbed young man who held a knife to his neck, but made no threatening

1  moves toward officers or others. Then, while retreating from the beanbag shots, Lukus was
2  shot 8 times with lethal force and was killed. The Ninth Circuit held that the officers were
3  not entitled to qualified immunity for firing the beanbag rounds because Lukus made no
4  threatening moves. "He showed no signs of attempting to move until after he was fired
5  upon." Id. at 874. Here, in contrast, plaintiff admits that at the moment of the shooting, he
6  moved to stand up from a seated position in the direction of an officer who stood less than
7  10 feet away. A reasonable officer in Officer Smith's position could have believed at that
8  moment that Brandon was a threat to the officers and that the use of less-than-lethal force
9  was justified. Accordingly, we conclude that there was no constitutional violation and
10 Officer Smith is entitled to summary judgment on plaintiff's Fourth Amendment claim.

## IV. State Law Negligence Claim

12 Plaintiff also asserts a state law negligence claim against the City of Chandler,
13 alleging that the City is vicariously liable for the negligent actions of its employees. Relying
14 on Landeros v. City of Tucson, 171 Ariz. 474, 475, 831 P.3d 850, 851 (Ct. App. 1992),
15 defendants argue that Arizona does not recognize a negligence claim against police officers
16 for their law enforcement activities and therefore plaintiff's negligence claim must be
17 dismissed. But Landeros held only that a city may be liable if its police officers are grossly
18 negligent in the investigation of a crime. Id. Landeros does not apply to a claim for
19 negligence in disarming an emotionally disturbed individual.

20 Nevertheless, even applying a simple negligence standard, we have already concluded
21 that Officer Smith's decision to use two beanbag rounds to subdue and disarm Brandon
22 before he had a chance to reach Officer Hawkins was justified and reasonable. Officers may
23 use proportionate, reasonable force whenever they reasonably believe it is necessary to
24 "effect an arrest . . . of a person whom the peace officer reasonably believes . . . is likely to
25 endanger human life or inflict serious bodily injury to another unless apprehended without
26 delay." Marquez v. City of Phoenix, 693 F.3d 1167, 1176 (9th Cir. 2012) (citing A.R.S. §
27 13-410(C)(2)(c)); see also A.R.S. § 13-409 (providing law enforcement officers with
28 immunity for all reasonable uses of non-deadly force); A.R.S. § 13-403(4) (providing

1  immunity to any person who uses physical force reasonably necessary to prevent a suicide).
2  Because we conclude that, under the totality of the circumstances, Officer Smith acted
3  reasonably and was justified in using force, plaintiff's negligence cannot succeed.

### V.

**IT IS ORDERED GRANTING** defendants' motion for summary judgment (doc. 35).

**IT IS ORDERED DENYING** defendants' motion to strike (doc. 50).

DATED this 16th day of April, 2014.

*Frederick J. Martone*
Frederick J. Martone
Senior United States District Judge

- 8 -